Matthew G. Monforton  (CA State Bar No. 175518)
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone:   (406) 570-2949
Facsimile:   (406) 551-6919
E-mail:      matthewmonforton@yahoo.com

Attorney for Plaintiff James Bozajian

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES BOZAJIAN,<br><br>                      Plaintiff,<br><br>        v.<br><br>COUNTY OF LOS ANGELES; STEVE COOLEY, individually and in his official capacity; CURTIS HAZELL, individually and in his official capacity, JOHN SPILLANE, individually and in his official capacity; JOHN ZAJEC, individually and in his official capacity; JACQUELYN LACEY, individually and in her official capacity, JANET MOORE, individually and in her official capacity; SHARON MATSUMOTO, individually and in her official capacity and DOES 1 – 10;<br><br>                      Defendants. | Case No. CV 12-00625 ODW (SSx)<br><br>**SECOND AMENDED COMPLAINT** |

1

**INTRODUCTION**

1.      This case involves retaliation taken against Plaintiff James Bozajian, a long-serving Deputy District Attorney, for engaging in protected First Amendment activity.  After being elected as District Attorney in 2000, Defendant Steve Cooley tried to coerce Bozajian into leaving an employee organization that would later become the union for Los Angeles County prosecutors.  Bozajian refused, which led to a decade of retaliation that escalated with each passing year.

2.      At first, Bozajian was subjected to punitive transfers.  Later, in 2006, he uncovered evidence showing that one of Cooley's top officials, Defendant Curt Hazell, had impregnated a witness in a death penalty case that Hazell had prosecuted.  The District Attorney's office covered-up this scandal for over two decades.  When Bozajian publicly exposed it, Defendants subjected him to additional retaliation, including falsifying his personnel records and ordering his supervisors to downgrade his performance evaluations.

3.      After that, Bozajian exercised his constitutional rights to oppose Cooley's political ambitions.  When Cooley pushed to have one of his close friends, Defendant Jacquelyn Lacey, become United States Attorney, Bozajian actively and publicly opposed her.

4.      As a result of Bozajian's protected speech, Defendants suspended him for 30 days without pay in 2010.  This 30-day suspension is the focus of this lawsuit.

5.      Defendants' acts of retaliation against Bozajian were blatant violations of his rights under the First Amendment to the United States Constitution.  He is therefore entitled to relief from this Court.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, as this action arises under the First and Fourteenth Amendments to the United States Constitution; under 28 U.S.C. § 1343(a)(3), in that Plaintiff seeks redress for

deprivations made under color of state law of rights, privileges, and immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4), in that Plaintiff seeks damages and equitable relief under 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; under 42 U.S.C. § 1988(b) for an award of attorneys fees; under 28 U.S.C. § 2201(a) to secure declaratory relief; and under 28 U.S.C. § 2202 to secure preliminary and permanent injunctive relief.

7.     Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. § 1391(b), because the events giving rise to the claims described in this Complaint occurred within Los Angeles County and all of the Defendants reside in Los Angeles County.

**PARTIES**

8.      Plaintiff James R. Bozajian resides in the County of Los Angeles.  He is a Deputy District Attorney for the County of Los Angeles and has been employed in that capacity since 1990.

9.     Defendant Los Angeles County is a municipal corporation formed under the laws of the State of California.  The remaining individual defendants, sued here in both their personal and official capacities, were at all relevant times mentioned herein employees and/or agents of Los Angeles County.

10.     Defendant Steve Cooley is, and at all times herein mentioned was, the District Attorney for the County of Los Angeles.  He was first elected to office in November 2000.  Defendant Cooley resides in the County of Los Angeles.

11.     Defendants Curtis Hazell, John Spillane, John Zajec, Jacquelyn Lacey, Janet Moore, and Sharon Matsumoto have been at all times pertinent to this action top ranking officials in the administration of Defendant Cooley.  Each of these Defendants has authority over promotions, demotions, transfers and discipline within the DA's Office and each has illegally discriminated against Bozajian in matters pertaining to promotions, transfers, and discipline.

12.     Bozajian is informed, believes, and thereon alleges that at all relevant times herein, each of the fictitiously named defendants was an agent, employee or co-conspirator of one or more of the named Defendants, and was acting within the course and scope of said agency or employment.  Bozajian is further informed, believes and thereon alleges that each of the fictitiously-named defendants aided and assisted the named Defendants in committing the wrongful acts alleged herein, and that Plaintiff's damages, as alleged herein, were proximately caused by such Defendants.

13.     Bozajian is informed, believe and thereon allege that Defendants, and each of them, conspired and agreed among themselves to do the acts complained of herein and were, in doing such acts, acting pursuant to and in furtherance of said conspiracy, and each Defendant sued herein is jointly and severally responsible and liable to Bozajian's for the damages alleged herein.

14.     Defendants, and each of them, and/or their agents/employees knew or should have known that each of the remaining co-Defendants, individually and together in varying combinations, was engaging in the conduct alleged herein.

## FACTS

**I     Bozajian's Career in the DA's Office and His Participation in ADDA**

15.     Bozajian became a Deputy District Attorney for Los Angeles County in 1990.

16.     His supervisors routinely rated him as "Outstanding" on his Performance Evaluations.

17.     Shortly after Bozajian joined the DA's Office, he became an active member of the Association of Deputy District Attorneys (ADDA), the largest local organization of prosecutors in the country, representing the approximately 1,000 prosecutors in the District Attorney's Office.

18.    In 2008, ADDA became a formal union representing rank-and-file Deputy District Attorneys in Los Angeles County.  Bozajian was instrumental in converting ADDA into a full-fledged union.  He has served on the Calabasas City Council since 1997, including four terms as mayor.  He has also served on the Executive Board of the California Contract Cities Association, and served as its President in 2011-2012.

19.    Bozajian has served as an elected member of the Board of Directors for ADDA continuously since 1993.  He was President of ADDA in 1996 and 1997, and has also served several terms as Vice-President and Secretary during his tenure on the Board.

20.    Bozajian is regarded highly enough by his colleagues to have been elected and re-elected to the ADDA Board of Directors by wide margins for 19 consecutive years,

21.    He is the longest-serving Director in the history of the organization and one of its most active members.

## II    The Longstanding Custom Within the County of Retaliating Against Prosecutors Who Criticize the Cooley Administration

22.    There is a longstanding custom within the County of Los Angeles of retaliating against prosecutors who criticize the Cooley Administration or are members of associations Cooley opposes.  Examples of this custom are shown below.

### A.    _Punitive Transfers Against Bozajian Resulting From His Participation In ADDA_

23.    In 1998, Bozajian and Defendant Cooley were close friends, close enough that Defendant Cooley relied upon Bozajian as a key political advisor in

helping him lay the groundwork for a campaign to be elected District Attorney in the 2000 election.

24.     Bozajian performed several important tasks for Cooley's campaign, including advising Cooley on the selection of John Shallman as campaign manager. Bozajian also prepared campaign literature and organized fundraisers for Cooley.

25.     One of the campaign promises Cooley made during his 2000 campaign was to restore a close working relationship with ADDA that his predecessors had supposedly damaged.

26.     Cooley criticized his predecessor, Gil Garcetti, for being aloof and unwilling to engage with his deputies and members of the public, communicating instead through a phalanx of political mouthpieces.

27.     Cooley denounced Garcetti for being at war with the ADDA for years and insulting all deputies by refusing to attend ADDA meetings.

28.     After Cooley took office in December 2000, however, his attitude towards ADDA shifted dramatically.  He viewed ADDA as a potential counterweight and a barrier to him obtaining total control over all aspects of the DA's Office.

29.     In 2001, Defendant Cooley personally confronted Bozajian and told him not to seek re-election to the ADDA Board of Directors.

30.     Bozajian did not comply with Cooley's stated desire for him to leave ADDA and remained an ADDA officer.

31.     Cooley's attitude toward ADDA and its decision makers has deteriorated significantly since that time.

32.     Cooley routinely expresses his hatred for ADDA members.  He has called ADDA's President a "whore" and "dirt."  He also referred to the entire ADDA Board of Directors, including Bozajian, as "shit."

33.     He has admitted that Bozajian was one of two Deputy District Attorneys (out of approximately 1,000) who were at the top of the list of his political enemies

within the District Attorney's office.  Cooley has shared his strong sentiments about Bozajian with his management staff.

34.     Between 2001 and 2011, Bozajian was transferred on virtually an annual basis.

35.     This frequency of transfers is unprecedented for a Deputy District Attorney of Bozajian's level of seniority and experience.

36.     Several of these assignments were punitive and ordered personally by Defendant Cooley, something that is highly unusual.

37.     During this time period, Bozajian's supervisors intensely scrutinized his actions and frequently limited the scope of his duties.

38.     Cooley directed these punitive transfers as a result of Bozajian's criticisms of Cooley and Bozajian's association with ADDA.

B.     *Punitive Transfer of ADDA President Steve Ipsen For Criticizing Judges Supported by Cooley*

39.     In June 2003, Steve Ipsen, who was then ADDA's president, filed a complaint with the California Commission on Judicial Performance alleging that some Los Angeles Superior Court judges illegally ordered the release of several defendants, including one defendant who committed a murder shortly after his release.

40.     Later in November 2003, Ipsen published an advertisement in the *Los Angeles Daily Journal* calling for the defeat of the judges in the next election.

41.     Defendant Cooley opposed Ipsen's actions and endorsed each of these judges and attended fundraisers to assist in their re-election.

42.     As a result of this speech, Cooley retaliated against Ipsen, and sought to interfere with his free speech rights by transferring him to the most remote branch office, the Antelope Valley Branch in Lancaster, approximately 70 miles north of downtown Los Angeles.  As there were no open assignments in Lancaster at that time,

7

1  Defendants facilitated Ipsen's punitive transfer by simultaneously transferring another

2  Grade IV deputy out of Lancaster.  This deputy had been performing well in

3  Lancaster, and did not want to be moved from his assignment.

4

5      *C.  Retaliation Against Bozajian in 2005 for Speech*

6           *Critical of Cooley*

7

8      43.    In 2005, Cooley sued the citizens of Los Angeles County, at taxpayer

9  expense, in an effort to overturn voter-imposed term limits and thereby extend his own

10  tenure in office.  Plaintiff and ADDA publicly criticized this action.

11      44.    ADDA and Bozajian have consistently and publicly opposed much of

12  Cooley's political agenda since 2005 on such issues as California's Three Strikes law.

13      45.    After a jury acquitted Robert Blake of murder charges in 2005, Cooley

14  publicly stated that the verdict was rendered by an "incredibly stupid jury."

15      46.    Bozajian and ADDA were publicly critical of these remarks.

16      47.    In January 2006, the District Attorney dispatched two pairs of armed

17  investigators to personally serve Bozajian and Ipsen with letters signed by Defendant

18  Spillane.

19      48.    The letters ordered Bozajian to cease sending out e-mails relating to

20  ADDA business, threatening consequences up to and including termination of

21  employment.

22      49.    Bozajian had never sent any such communications.

23      50.    No other personnel were so warned, even though numerous other

24  prosecutors had sent such communications, often with the approval of the DA's

25  Office.

26

27

28

8

D. *Retaliation Against Bozajian For His Public Exposure of Hazell's Sexual Encounter With, and Impregnation of, a Witness in Hazell's Death Penalty Case*

51.     In 2005, Bozajian sought a promotion to Grade IV Deputy District Attorney.  The promotion would have allowed him to assume greater job responsibilities in addition to increasing his wages.

52.     Cooley denied Bozajian the promotion he sought even though his qualifications were superior to those of several other prosecutors promoted at that same time.

53.     Bozajian responded to this denial by appealing to the Los Angeles Civil Service Commission in 2006.

54.     In marshalling evidence to support his Civil Service Complaint, Bozajian acquired shocking evidence of prosecutorial misconduct committed in a death penalty case by Defendant Hazell, the prosecutor who had handled the case.

55.     The case Hazell handled was *People v. Adam Miranda*, a death penalty case.

56.     While prosecuting the case, Hazell had a sexual relationship with Donna Navarro, a stripper with a lengthy criminal record.

57.     Hazell impregnated Navarro.

58.     Hazell called Navarro as a key witness for the prosecution.

59.     The jury trial in *Miranda I* concluded with a conviction and death sentence in 1982.

60.     Hazell held press conference in which he gave Navarro a check for $25,000.

61.     Hazell did not disclose the relationship with this witness and hid the relationship from the defense and the public, efforts that included (failed) attempts to seal public documents.

62.     After Defendant Hazell unfairly denied Bozajian a promotion because

Bozajian was allegedly "unprofessional," Bozajian began researching Defendant Hazell's background. In so doing, he uncovered evidence of Defendant Hazell's sordid past.

63. As part of his research, Bozajian made a request for documents pursuant to California's Public Records Act for all materials in the District Attorney's possession with respect to *Miranda*.

64. Defendant Cooley responded by claiming that his office was unable to locate the files.

65. Bozajian disclosed to the media the evidence he had accumulated regarding Hazell's conduct during the Mirada prosecution.

66. Immediately after Bozajian publicly revealed the details involving Hazell's scandalous conduct, the District Attorney's Office formally notified Miranda's defense team of Defendant Hazell's sexual relationship with Navarro – over two decades after the fact.

67. Miranda's legal team incorporated these facts into a petition for habeas corpus that they filed in the California Supreme Court.

68. Miranda's judgment of death has since been reduced to life without parole.

69. Hazell has been one of Cooley's closest friends and advisors since the two of them were college roommates many years ago.

70. No disciplinary action has ever been taken against Hazell.

71. Rather, Defendant Cooley has promoted Hazell three times, most recently to the third-in-command position of Assistant District Attorney.

72. As part of his duties, Hazell oversees the Public Integrity Division and chairs the Special Circumstances Committee, which monitors the prosecution of all capital cases in the County.

73. After Bozajian exposed Hazell's sordid affair with a death penalty witness, Lacey ordered Bozajian's supervisors to lower his annual Performance

Evaluations from an "Outstanding" rating to a lower rating.  No other employee assigned to Bozajian's work location (wherein at any given time 25-30 prosecutors worked) had been treated in such fashion.

74.    On January 11, 2008, Defendants suspended Bozajian for five (5) days without pay, due to his allegedly "unprofessional, threatening and un-businesslike conduct…."

75.    This suspension was not based upon Bozajian's work related activities but, instead, resulted from Defendants' animus against Bozajian for his active participation in ADDA and his exposure of Defendant Hazell's sordid affair with a death penalty witness.

   E.    *The Use of DA Investigators to Gag Media Coverage of Prosecutors Critical of Cooley*

76.    The Cooley Administration has used District Attorney Investigators to intimidate and harass media outlets that have sought to give Cooley's critics in the District Attorney's Office a forum to express their views.

77.    One example is the Full Disclosure Network, a cable news program managed by Leslie Dutton, an Emmy-award winning producer.

78.    In late 2006 and early 2007, Dutton attempted to organize a law enforcement training conference at the Bonaventure Hotel in Los Angeles entitled "Gangs, Drugs and Immigration."

79.    In a letter dated March 14, 2007, Los Angeles County Sheriff Lee Baca stated to Dutton that he was "pleased to be a co-sponsor" and further stated that "[i]t is with great enthusiasm that I endorse this project and urge law enforcement personnel to support and attend the conference."

80.    ADDA President Steve Ipsen sent a letter to Dutton on May 23, 2007, stating that ADDA was proud to co-sponsor the conference with Sheriff Baca.

11

81.     Shortly thereafter, Dutton e-mailed an announcement regarding the conference to deputy prosecutors in the DA's Office.  This e-mail explained that the sponsors of the conference included ADDA.

82.     On July 5, 2007, two armed DA Investigators showed up unannounced at Dutton's office.  The Investigators repeatedly demanded that Dutton tell them who had given her the e-mail addresses for deputy district attorneys to whom Dutton had e-mailed the conference announcement.

83.     Dutton asked the Investigators why they insisted upon this information. The Investigators responded that the DA Office's computer system needed to be protected from viruses.

84.     When Dutton asked the Investigators if any of the e-mails she sent had contained viruses, they admitted that none had.

85.     Dutton asked if she had done anything illegal in sending the e-mails.  The DA Investigators admitted that nothing illegal had occurred, begging the question of why two armed investigators arrived unannounced at Dutton's office in the first place.

86.     Two weeks after DA Investigators interrogated Dutton, the Los Angeles Sheriff's Department withdrew its support for the conference.  Dutton was forced to cancel it.

87.     Bozajian is informed, believes, and thereon allege that the Cooley Administration pressured the Sheriff's Department to withdraw its support from Dutton's conference due to ADDA's participation in it.

F.     *Punitive Transfers of Marc Debbaudt to Juvenile Court For His Opposition to Cooley's Re-Election Campaign*

88.     In July 2007, Marc Debbaudt, another prosecutor who has actively supported ADDA and unionization, wrote a letter on behalf of ADDA to unions

12

1   throughout Los Angeles County asking them to withhold support from Cooley's 2008
2   campaign for re-election due to Cooley's anti-union actions.

3        89.    Defendant Lacey responded by stating at one of ADDA's board meetings
4   that Cooley had directed her to inquire if Debbaudt had the authority of the ADDA to
5   send the letter.

6        90.    Thereafter, Defendant Lacey stated that Cooley directed her to
7   investigate the allegations contained in the letter and to discredit Debbaudt and the
8   letter.  She did not explain what authority Defendant Cooley had to use County
9   resources to discredit the political criticisms of Cooley that were contained in the
10  letter.

11       91.    During several ADDA meetings in the summer of 2008, Debbaudt
12  repeatedly criticized the Administration's unilateral imposition of a new Performance
13  Evaluation system upon deputy district attorneys, without negotiation with the
14  ADDA.  Debbaudt drafted the unfair labor practices complaint which was filed with
15  ERCOM challenging the legality of these new PE procedures which are a subject of
16  mandatory bargaining.

17       92.    In September 2008, Cooley subjected Debbaudt to a punitive transfer as a
18  result of his role in drafting this complaint as well as for other acts taken in his
19  capacity as an ADDA member.

20       93.    The Cooley Administration decided in September 2008 to transfer
21  Debbaudt to an entry-level position in the East Lake Juvenile Court.

22       94.    Juvenile court assignments are almost always filled by inexperienced
23  deputies, not those such as Debbaudt with twenty-plus years of experience and
24  "Outstanding" ratings from supervisors.

25       95.    Days later, by October 9, 2008, the Administration decided to transfer
26  Debbaudt to an entry-level assignment in Pomona Juvenile Court, an assignment
27  located 42 miles from Debbaudt's home - such long commutes are commonly referred
28  to in the District Attorney's office as an act of "freeway therapy."

96.    Defendant Lacey, through her attorney, later admitted that "Mr. Debbaudt was not transferred as part of the usual, normal every couple of months transfer."  She also admitted that, though office policy is to transfer deputies based upon the needs of the office, there was no legitimate need in Pomona Juvenile for Debbaudt.  She further admitted that Cooley himself ordered Debbaudt's transfer, that such orders from Cooley were infrequent, and that Debbaudt was the only Grade IV deputy district attorney that she was aware of transferred to an entry-level juvenile assignment.

97.    After Debbaudt spent two months in Pomona Juvenile Court, the Administration transferred him to the Sylmar Juvenile Court in January 2009.

98.    It made this transfer despite the fact that Grade IV deputies such as Debbaudt are normally permitted to stay in a particular assignment for on average approximately three and one half years.

99.    Debbaudt remained at his Sylmar Juvenile assignment until 2011.

G.    *Retaliation Against Bozajian for Speech Critical of Cooley During His 2008 Re-Election*

100.    In anticipation of the 2008 California Primary Election, Bozajian published in May 2008 a political newsletter, *The Loyal Opposition*, critical of Cooley's re-election.  Among other places, hard copies of that newsletter were mailed via the U.S. Post Office (at Plaintiff's expense) to the offices of Deputy District Attorneys throughout the County.

101.    After hastily conferring on the day the newsletter was delivered, Cooley, Spillane, Lacey, and Matsumoto conspired to order the illegal impoundment of this properly stamped and delivered mail.

102.    That same day, Bozajian's office was ransacked by District Attorney Investigators.

14

103.   The investigators searched Bozajian's effects and seized property belonging to ADDA.

104.   They performed their search and seizure when Bozajian was attending a municipal conference on behalf of the City of Calabasas.

105.   That same day, Cooley ordered Lacey, Spillane, and Zajec to transfer Bozajian immediately to an undesirable, punitive, entry-level assignment despite his status as a veteran prosecutor.

106.   Seizing Bozajian's mailings contradicted the Administration's prior directions to prosecutors regarding distribution of political/labor mass mailings. Bozajian had mailed his materials in conformity with regulations Defendant Lacey conveyed to ADDA at one of its meetings.

107.   At the time the newsletter was confiscated, the Administration authorized the distribution of another mailing in precisely the same manner. That mailing was an invitation to an election night victory party to be hosted by the Cooley campaign on Election Night in 2008.

### H.   *Lacey's Admission that Union-Related Speech by Prosecutors Diminished Promotion Opportunities for Them*

108.   Shortly before October 17, 2008, Defendant Lacey met with Robert Dver, a 24-year veteran prosecutor and, at that time, the Assistant Head Deputy of the Training Division of the DA's Office.

109.   When they met, Dver told Defendant Lacey that he wanted to join ADDA's Contract Negotiating Team, which was scheduled to begin negotiating with Cooley's management team later in the year.  ADDA believed Dver would be a significant asset to its team, as both ADDA's leadership and Defendants regarded Dver as highly ethical and one of the best prosecutors in the DA's Office.

15

110.   Dver told Defendant Lacey that he wanted to join ADDA's Contract Negotiating Team because he believed he could help achieve reasonable compromises between ADDA and the Cooley Administration.

111.   Defendant Lacey told Dver not to join ADDA's negotiating team and also told him not to even bring up the subject with Defendant Cooley.  To do so, she said, would be a "disaster" for Dver's career.

112.   Lacey later admitted in sworn testimony that Cooley regarded ADDA's president as "dishonest and felt quite frankly that anybody associated with [him] would be ratifying or endorsing that dishonesty."

113.   After Dver discussed with Cooley on October 17, 2008, his desire to participate on ADDA's negotiating team, Cooley transferred Dver out of the Training Division.  Cooley also demoted Dver from his position as Assistant Head Deputy and stripped him of his supervisory tasks.

### III.   Bozajian's 30-Day Suspension for Opposing Defendant Lacey's Efforts to Become United States Attorney

114.   In early 2009, Defendant Lacey applied for the position of United States Attorney for the Central District of California.

115.   Defendant Cooley strongly supported Lacey's efforts, and allowed her to use office resources to pursue her goal of becoming United States Attorney.

116.   Believing Defendant Lacey to be unfit for such an appointment, Bozajian announced his intention to the Cooley Administration and the public to actively participate in the political process to prevent Lacey from securing this appointment.

117.   He made this intention clear on April 6, 2009, when he submitted a request under the California Public Records Act for documents pertaining to Lacey.

In that request, he expressly stated that he was seeking records that he believed would show Lacey to be unfit for the appointment.

118.   During the next several months, Bozajian continued his efforts to prevent Lacey from being named as United States Attorney.

119.   On October 19, 2009, in a letter titled "Notice of Intent to Suspend," the District Attorney's Office notified Bozajian that he would be suspended for thirty (30) days without pay.

120.   This letter was signed by Defendant Janet Moore.

121.   All of the acts described in the letter that occurred after February 9, 2009, concerned Bozajian's protected speech in opposition to Lacey's nomination to become United States Attorney.

122.   Had Bozajian not engaged in protected speech concerning Lacey's nomination to become United States Attorney, he would not have been suspended.

123.   This suspension was motivated by Bozajian's public efforts to prevent Lacey from becoming the United States Attorney.

124.   It was also motivated by Bozajian's prior speech concerning Hazell's relationship with a death penalty witness and Cooley's qualifications for re-election to the office of District Attorney

125.   Bozajian is informed, believes, and thereon alleges that Defendants Cooley, Spillane, and Lacey, who were Moore's superiors at the time she issued the letter, approved Bozajian's unlawful suspension in order to retaliate against him for engaging in protected speech.

126.   Hazell has admitted that he and other members of the Cooley Administration have had discussions about allegations concerning Bozajian that "went on many years."

127.   The October 2009 letter includes claims of allegedly disrespectful remarks made by Bozajian against Zajec and Spillane.

128. Bozajian is informed, believes, and thereon alleges that Defendants Hazell and Zajec encouraged Bozajian's unlawful suspension in order to retaliate against him for engaging in protected speech.

129. On January 6, 2010, Bozajian received a letter entitled "Notice of Suspension" informing him that his 30-day suspension would commence on January 25, 2010.

130. The letter was written by Defendant Sharon Matsumoto.

131. Bozajian's 30-day suspension did in fact commence on January 25, 2010.

## IV.   Bozajian's Civil Service Complaint Regarding His 2010 Suspension

132. Bozajian filed a 17-page complaint with the Los Angeles County Civil Service Commission on January 26, 2010.

133. This complaint was based upon Bozajian's 30-day suspension that had commenced the previous day.

134. Bozajian filed as exhibits to his complaint copies of the October 2009 "Notice of Intent to Suspend" and the January 2010 "Notice of Suspension."

135. The civil service case remained active until June 27, 2012, when Bozajian withdrew the complaint in order to focus on his federal suit.

## FIRST CAUSE OF ACTION

### (Violation of U.S. Constitution, Amendment I – Freedom of Speech)

### (Against All Individual Defendants)

136. Bozajian hereby incorporates by reference all of the foregoing allegations as if set forth fully herein.

137.   Bozajian has engaged in speech on matters of public concern, such as the qualifications of Cooley to be District Attorney, the qualifications of Lacey to be United States Attorney, and the improper sexual relationship between a member of the Cooley Administration and a witness in a death penalty case.

138.   The Individual Defendants retaliated against Bozajian by suspending him for 30 days commencing on January 25, 2010.

139.   Bozajian's protected speech was a substantial or motivating factor for this suspension.

140.   When Bozajian engaged in this speech, he did so as a citizen and not as part of his official duties.

141.   The Individual Defendants' actions violated Bozajian's right of free speech guaranteed by the First Amendment to the United States Constitution, made applicable to state and local governments through the Due Process Clause of the Fourteenth Amendment.


## SECOND CAUSE OF ACTION

**(Violation of U.S. Constitution, Amendment I – Freedom of Speech)**

**(Against the County of Los Angeles)**


142.   Bozajian hereby incorporates by reference all of the foregoing allegations as if set forth fully herein.

143.   Bozajian has engaged in speech on matters of public concern, such as the qualifications of Cooley to be District Attorney, the qualifications of Lacey to be United States Attorney, and the improper sexual relationship between a member of the Cooley Administration and a witness in a death penalty case that he was prosecuting.

144.   The Individual Defendants retaliated against Bozajian by suspending him for 30 days commencing on January 25, 2010.

145.   Bozajian's protected speech was a substantial or motivating factor for this suspension.

146.   When Bozajian engaged in this speech, he did so as a citizen and not as part of his official duties

147.   The Individual Defendants acted under color of state law.

148.   The Individual Defendants' actions violated Bozajian's right of free speech guaranteed by the First Amendment to the United States Constitution, made applicable to state and local governments through the Due Process Clause of the Fourteenth Amendment.

149.   The Individual Defendants acted pursuant to a longstanding custom of the County of Los Angeles of retaliating against prosecutors who criticize the Cooley Administration or are members of organizations that Cooley opposes.

**THIRD CAUSE OF ACTION**

**(Violation of U.S. Constitution, Amendment I – Freedom of Association)**

**(Against All Individual Defendants)**

150.   Bozajian hereby incorporates by reference all of the foregoing allegations as if set forth fully herein.

151.   Bozajian desires to gather together with other members of ADDA and promote the activities of ADDA including, but not limited to, organizing deputy district attorneys, representing deputy district attorneys in negotiations with the County regarding collective bargaining agreements, and advancing legislative

proposals in the California Legislature and the County Board of Supervisors that are beneficial to ADDA members and the criminal justice system.

152.   The Individual Defendants have hindered Bozajian's efforts to associate with ADDA by retaliating against him based upon his membership in ADDA.

153.   Accordingly, the Individual Defendants have violated Bozajian's right of free association guaranteed by the First Amendment to the United States Constitution, made applicable to state and local governments through the Due Process Clause of the Fourteenth Amendment.

**FOURTH CAUSE OF ACTION**

**(Violation of U.S. Constitution, Amendment XIV – Equal Protection)**

**(Against All Individual Defendants)**

154.   Bozajian hereby incorporates by reference all of the foregoing allegations as if set forth fully herein.

155.   The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly-situated persons equally.

156.   The Individual Defendants' retaliating against Bozajian based upon his protected speech, while refraining from harassing similarly-situated County employees who do not criticize the Cooley Administration, resulted in unlawful discrimination against him.

157.   By the treating Bozajian in such a discriminatory manner, the Individual Defendants have violated the Equal Protection Clause of the Fourteenth Amendment.

**WHEREFORE**, Plaintiff prays for judgment against Defendants and that the Court:

A.   Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter and claims in controversy in order that such declarations shall have the force and effect of a final judgment and that the Court retain jurisdiction of this matter for the purpose of enforcing the Court's Orders;

B.   Pursuant to 28 U.S.C. §2201, declare that the Defendants' policies and practices, as alleged above, violate the First and Fourteenth Amendments to the United States Constitution;

C.   Pursuant to 28 U.S.C. §2202, F.R.C.P. Rule 65, and 42 U.S.C. § 1983, preliminarily and permanently enjoin the Defendants from enforcing their unconstitutional policies and practices against Plaintiff;

D.   Pursuant to 42 U.S.C. §1988, and other applicable law, award the Plaintiff his costs and expenses incurred in bringing this action, including its reasonable attorneys' fees;

E.   Award Plaintiff compensatory damages as to all Defendants and punitive damages as to all Individual Defendants for the injuries suffered in violation of federal law in an amount to be determined by a jury; and

F.   Grant such other and further relief as the Court deems equitable and proper.

**REQUEST FOR JURY TRIAL**

Plaintiff request a jury trial for all issues so triable.

DATED: September 17, 2012          Respectfully submitted,

MONFORTON LAW OFFICES, PLLC

/s/ Matthew G. Monforton
Matthew G. Monforton, Esq.

Attorney for Plaintiff James Bozajian

23

**PROOF OF SERVICE**

On September 17, 2012, I served a true and correct copy of Plaintiff's Second Amended Complaint to the following persons by placing a true copy thereof enclosed in a stamped, sealed envelope addressed as follows:

Linda Miller Savitt
Rami Yomtov
Ballard Rosenberg, Golper & Savitt, LLP
500 N. Brand Blvd., 20th Fl.
Glendale, CA 91203-9946

I deposited said envelope this day in the U.S. Mail.

I declare under penalty of perjury under the laws of the United States that foregoing is true and correct.

Executed on September 17 , 2012 at Bozeman, Montana.

/s/ Matthew Monforton
_____